UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOE MUSTARD,

    Plaintiff,

v.

TRIMEN, INC.,

    Defendant.

:

Case No. 2:21-cv-2315
Judge Sarah D. Morrison
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

Plaintiff Joe Mustard filed a two-count Complaint against his former employer, Defendant Trimen, Inc. (d/b/a Amanda Plumbing), alleging violations of the Americans with Disabilities Act. (Compl., ECF No. 1.) Trimen moves for summary judgment on both counts. (Mot., ECF No. 16.) Mr. Mustard responded in opposition (Resp., ECF No. 19) and Trimen replied (Reply, ECF No. 24). For the reasons set forth below, Trimen's Motion for Summary Judgment is **GRANTED**.

**I.    BACKGROUND**

    **A.    Mr. Mustard began working for Trimen in 2016.**

Trimen is a service plumbing and repair company located in central Ohio. (D. Hines Dep., ECF No. 18, 14:2–4.) Doug Hines founded the business and, until his retirement in 2020, ran all aspects of its operation. (D. Hines Aff., Mot. Ex. 1, ¶ 2.) Although Mr. Hines is still a partner in the business, the day-to-day is now run by the other partners, Amanda Hines (Mr. Hines's daughter) and Hayden Taylor (Ms. Hines's husband). (*Id.*)

Mr. Mustard began working for Trimen as an apprentice in August 2016. (Mustard Aff., Resp. Ex. 2, ¶¶ 3–4.) After eight months of training, he was promoted to Plumber. (*Id.*, ¶ 4.)

### B. In December 2018, Mr. Mustard began to experience frequent migraine headaches that required him to call off work.

Mr. Mustard has a long history of migraine headaches. (*Id.*, ¶ 6.) When he experiences a migraine, Mr. Mustard "suffer[s] from extreme eye pain, dizziness, vomiting, and pounding headaches." (*Id.*, ¶ 8.) Although he has tried to treat his migraines with prescription medication, he reports the most success with simply lying down in a dark room. (*Id.*, ¶¶ 10–11.)

Though once infrequent, Mr. Mustard began to experience migraines more regularly in December 2018. (*Id.*, ¶ 7. *See also* Resp. Ex. 5.) On December 14, for the first time, Mr. Mustard called off work for a migraine. (Resp. Ex. 5. *See also* Mustard Dep., ECF No. 15, 68:12–24.) Throughout 2019, Mr. Mustard called off work or left early multiple times because of migraines.[1] (*See* Resp. Ex. 5.) Mr.

---

[1] Exhibit 7 to Mr. Mustard's Response contains After-Visit Summaries documenting appointments on: December 9, 2018 (Rhodes emergency department); December 13, 2018 (same); December 17, 2018 (OSU Family Practice); January 8, 2019 (Neurologic Specialists); January 23, 2019 (same); February 5, 2019 (Neurology Worthington); October 28, 2019 (Neurology West Broad); November 12, 2019 (OSU Family Practice); November 21, 2019 (same); November 22, 2019 (Neurology West Broad); and December 17, 2019 (Neurology Worthington). Trimen argues in its Reply that these summaries are inadmissible hearsay. (Reply, 4 n.1.) *See Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) ("[H]earsay evidence cannot be considered on a motion for summary judgment.") (citation omitted). Accordingly, these records are neither summarized nor considered here.
 Although "the nonmoving party [need not] produce evidence in a form that would be admissible at trial in order to avoid summary judgment[,]" *Celotex*, 477 U.S. at 324, the records in Exhibit 7, even when considered, do not alter the Court's determination.

Mustard had no recorded absences between January 22, 2019, and July 24, 2019. (*Id.*) But, by the end of 2019, he experienced between one and three migraines each week. (Mustard Aff., ¶ 14.)

In June 2019, Mr. Mustard asked Mr. and Ms. Hines to allow him "to take time off work whenever [he] was having migraines." (*Id.*, ¶ 13.) At deposition, Mr. Mustard testified that he would "usually call or text" Ms. Hines to request time off, and "[s]he was pretty understanding." (Mustard Dep., 78:1–21.) Mr. Mustard further testified:

> Q. [Amanda] never threatened to terminate you because you were calling off sick, correct?
>
> A. I don't — no.
>
> Q. Anytime you called off sick due to migraines when you were on the job were you allowed to go home?
>
> A. The majority of the time, yes.
>
> Q. And if you called off sick because you were already at home or in the morning before you started your workday were you allowed to stay home?
>
> A. Yes.

(*Id.*, 79:6–15.) Although Mr. Mustard first says that Trimen allowed him to leave work for a migraine "the majority of the time" (*id.*, 79:11), he was unable to identify any occasion on which his request was denied (*id.*, 122:23–123:8). He ultimately conceded that there was no such occasion. (*Id.*, 92:2–7, 98:10–14).

While Ms. Hines was "understanding" when Mr. Mustard asked for time off, and always granted those requests, Mr. Hines "bitch[ed] at [him] about it." (*Id.*, 123:2–8.)

3

## C. Throughout 2019, Mr. Mustard exhibited poor job performance.

In June 2019, Trimen "began to deduct arbitrary amounts of money from [Mr. Mustard's] paychecks allegedly for making errors on projects." (*Id.*, 92:11–15.) When a Trimen customer complains about an error made by one of its plumbers, the company sends a plumber back to the job site to make repairs free of charge—these are known as "callbacks." (*Id.*, 95:8–18. *See also* ECF No. 15-3.) At some point, Trimen determined that "there were too many callbacks," and began docking the offending plumber's pay. (Mustard Dep., 95:16–18.) Mr. Hines also had a practice of "yelling" when a plumber had a callback. (*Id.*, 93:11–14.) Every Trimen plumber had callbacks. (*Id.*, 102:7–8.) The differentiating factor, in Ms. Hines's words, "was how many callbacks and the quality of callbacks, if they were negligent or lazy where you couldn't address that with [the plumber]." (A. Hines Dep., 105:19–23.) Mr. Mustard admits that he had callbacks, and that he was not singled-out for deductions, but he does not know how much was deducted or how those amounts were calculated. (Mustard Dep., 93:9–94:23, 95:2–3, 95:19–20, 102:11–13.)

In addition to pay-docking and "yelling," Mr. Mustard received verbal counseling, coaching, and criticism from Mr. Hines. (*Id.*, 113:21–114:3. *See also* D. Hines Dep., 37:5–38:22.) But, in Mr. Hines's view, Mr. Mustard was "very dismissive" of those efforts—he "didn't want to talk about [his callbacks]" and "acted like none of them were his fault." (D. Hines Dep., 21:12–14.) He believed Mr. Mustard was "unwilling[ ] to accept them or learn from them or even acknowledge that it was his fault." (*Id.*, 38:20–22.)

4

In the second half of 2019, Mr. Hines began "having serious issues with [Mr. Mustard's] attitude[.]" (*Id.*, 37:6–8.) Mr. Mustard stopped answering Mr. Hines's calls, hung up on Mr. Hines on "numerous occasions," and, once, "turned his back and walked out of the office" during a meeting with Mr. Hines. (*Id.*, 41:20–42:11. *See also id.*, 21:15–20, 74:22–75:3.) Mr. Hines warned Mr. Mustard more than once—and, possibly, as many as twelve times—that he would be terminated if his performance did not improve. (*Id.*, 38:15–22; Mustard Dep., 114:17–115:10.) During that same period, Mr. Mustard's callbacks totaled more than $14,000. (A. Hines Aff., Mot. Ex. 3, ¶ 3.)

D.  **Trimen terminated Mr. Mustard on January 30, 2020.**

On January 30, 2020, Mr. Hines, Mr. Taylor, and Mr. Mustard met in Mr. Hines's office. (Mustard Dep., 99:1–18.) During that meeting, Mr. Mustard was terminated from employment with Trimen. (*Id.*)

Accounts of the January 30 meeting differ in important ways. According to Mr. Mustard:

> I remember [Doug Hines] saying that due to my medical condition that I wasn't able to perform my job duties anymore.
>
> I asked for some examples, and he brought up the callback process. I argued with him about that somewhat.
>
> Then he told me I needed to get all of my tools out of my truck, and I asked if I could drive my truck home and unload the tools and bring the truck back and he denied me of that.
>
> Then I went outside of the office to and called my wife to have her come pick me up, and I was approached by — Hayden came out there to talk to me and then Amanda came out there to talk to me. They both let me know that they thought that it was a bad decision that was

5

> being made and that they both had talked to Doug the night before and tried to get him to not fire me but it was 100 percent his decision.

(*Id.*, 100:6–23.)

Both Mr. Hines and Mr. Taylor deny telling Mr. Mustard that he was being terminated because of his migraines. (D. Hines Aff., ¶ 4. Taylor Aff., Mot. Ex. 2, ¶ 2.) Instead, Mr. Hines asserts that he "discussed with [Mr. Mustard] his overall job performance, his numerous customer callbacks, and his bad attitude." (D. Hines Aff., ¶ 4.) In Mr. Taylor's recollection, "Mr. Hines specifically terminated [Mr. Mustard] only because of his bad attitude, lack of respect, and poor job performance/callbacks." (Taylor Aff., ¶ 2.)

Following his termination, Mr. Mustard filed a charge with the Equal Employment Opportunity Commission. (ECF No. 15-2, PAGEID # 221.) After the EEOC issued a right-to-sue letter, Mr. Mustard brought this action. (*See* Compl.) In his Complaint, Mr. Mustard asserts two claims under the ADA: Disability Discrimination (Count I); and Failure to Accommodate (Count II). (*Id.*)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving

6

party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

### III. ANALYSIS

#### A. Disability Discrimination (Count I)

The Americans with Disabilities Act makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability[.]" 42 U.S.C. § 12112(a). Mr. Mustard alleges that Trimen did just that when it terminated his employment.[2] (Compl., ¶¶ 61–69.) When such claims are supported by indirect

---

[2] Although the factual allegations in the Complaint also discuss deductions from pay, the Complaint does not connect the deductions to Mr. Mustard's disability. (*See, e.g.*, Compl., ¶ 68 (alleging that Trimen "violated the Americans with Disabilities Act when it terminated Mustard" but saying nothing about deductions from pay).) Even if the Court were to construe the Complaint as alleging that Mr. Mustard's pay was docked for unlawfully discriminatory reasons, the claim

7

evidence, they are analyzed under the *McDonnell Douglas* burden-shifting framework.³ *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under *McDonnell Douglas*, a plaintiff must first make a *prima facie* case of discrimination by showing that: (1) he has a disability; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) his employer knew or had reason to know of the disability; and (5) he was replaced or his position remained open. *Id.* (quoting *Whitfield v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011)). "[T]he burden then shifts to the employer to demonstrate that there was a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* On such demonstration, the burden shifts back to the

---

would fail. Mr. Mustard testified that Trimen reduced its plumbers' pay for excessive callbacks and conceded that he was not "singled-out" for pay reductions. Accordingly, Mr. Mustard fails to establish a genuine issue of material fact that the reason given for the deductions (excessive callbacks) was pretext for unlawful discrimination.

³ Discrimination claims supported by direct evidence and indirect evidence are analyzed under different tests. *See Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852–53 (6th Cir. 2018). Although Trimen's motion for summary judgment on Count I is not framed in the terms of *McDonnell Douglas*, Mr. Mustard's Response is. (*See* Resp., 6 (arguing that Mr. Mustard has made a *prima facie* case), 14–15 (arguing that the evidence presented creates a genuine question of material fact as to whether Trimen's stated reason for terminating Mr. Mustard was pretext for unlawful discrimination).) Accordingly, the Court construes Count I as alleging discriminatory discharge proved by indirect evidence and analyzes it as such. *Cf. Equal Emp't Opportunity Comm'n v. Clarksville Health Sys., G.P.*, — F. Supp. 3d —, 2022 WL 3009502, at *7 (M.D. Tenn. July 28, 2022) (concluding that a "statement that merely expresses concern about [an employee's] ability to perform job requirements is *not* direct evidence of disability discrimination" because a reviewing court must still infer discriminatory animus) (emphasis in original) (citation omitted).

plaintiff, who "must then show that the reason given by the employer was actually a pretext designed to mask unlawful discrimination." *Id.*

Trimen first argues that Mr. Mustard fails to make a *prima facie* case because he cannot show that he has a disability within the meaning of the ADA. (Mot., 8.) It further argues that Mr. Mustard has not shown that Trimen's stated reasons for terminating him—his "attitude" and poor job performance—were pretext for unlawful discrimination. (*Id.*, 13; Reply, 18.) As to the latter, the Court agrees.

### 1. The Court assumes that Mr. Mustard has made a p*rima facie* case.

Because Trimen's second argument is well-taken and dispositive, the Court will assume without deciding that Mr. Mustard has made a *prima facie* showing. *Cf. Darby v. Childvine, Inc.*, 964 F.3d 440, 445 (6th Cir. 2020) (quoting 42 U.S.C. § 12102(4)(A)) ("[F]or cases on the margin, the [ADA] includes a 'rule of construction' that tips in favor of coverage.")).

### 2. Trimen articulated a legitimate, non-discriminatory reason for Mr. Mustard's termination.

Trimen argues that it terminated Mr. Mustard because of his "attitude" and "numerous customer callbacks." (D. Hines Aff., ¶¶ 3–4; D. Hines Dep., 41:13–43:11. *See also* Taylor Aff., ¶ 2.) Mr. Hines testified, and Mr. Mustard does not dispute, that he warned Mr. Mustard, "if his attitude didn't change and his call-back rate didn't improve[,] he was on thin ice and would most likely be terminated."[4] (D.

---

[4] In his affidavit, Mr. Mustard says that he "was never told he would be fired in 90 days if my callbacks and attitude did not improve." (Mustard Aff., ¶ 23.) But

9

Hines Dep. 42:23–43:2; D. Hines Aff. ¶ 3; Mustard Dep. 114:17–23.) Nor does Mr. Mustard dispute that:

- Mr. Hines repeatedly "yelled" at Mr. Mustard because of his callbacks, and gave him verbal counseling, coaching, and criticism (Mustard Dep. 93:12–13; 113:21–114:3, 114:17–23);

- He had multiple callbacks while at Trimen (*id.*, 95:2–18, 109:9–11); and

- He walked out of meetings with Mr. Hines, hung up on Mr. Hines, or would not answer Mr. Hines's calls (*see* Mustard Aff., *generally*).

Poor performance and insubordination are legitimate, nondiscriminatory reasons for terminating an employee. *See, e.g., Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (identifying plaintiff's poor job performance as a legitimate, nondiscriminatory reason for plaintiff's termination); *Woodle v. Baptist Life Communities*, No. 1:12cv879, 2014 WL 806277, at *9 (S.D. Ohio Feb. 28, 2014) (Bowman, M.J.) (same as to insubordination and failure to follow direction). Trimen has satisfied its burden of production, and so the burden returns to Mr. Mustard.

### 3. Mr. Mustard fails to raise a genuine issue of material fact as to whether Trimen's proffered reason was pretext.

To establish pretext, a plaintiff must show that the employer's proffered reason "(1) had no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to warrant her removal." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d

---

he testified in deposition that Mr. Hines had indeed "threatened" to terminate him if his performance did not improve. (Mustard Dep., 114:17–22.) Only because he did not discuss whether such threats came with a deadline, Mr. Mustard avoids the "sham affidavit" rule—but it is a narrow miss. *See Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 842 (6th Cir. 2021) (explaining that the "sham affidavit" rule "provides that a party cannot create a genuine dispute of material fact with an affidavit that conflicts with the party's earlier testimony about the fact").

400, 422 (6th Cir. 2021). In other words, "a plaintiff must produce sufficient evidence from which a jury could reasonably reject the defendant's explanation of why it took the adverse employment action." *Wright v. Memphis Light, Gas & Water Div.*, 558 F. App'x 548, 554 (6th Cir. 2014) (internal quotation and citation omitted) (cleaned up). Mr. Mustard argues that a jury could reject Trimen's stated reason because (i) Mr. Mustard testified that Mr. Hines said his migraines prevented him from performing his job duties, (ii) no other plumber was fired for excessive callbacks, and (iii) he was terminated shortly after his migraines increased in frequency. The Court disagrees.

*Disputed statement.* Under Sixth Circuit precedent, a disability discrimination claim is viable only if the plaintiff's disability is the "but-for" cause of the adverse employment action. *Darby*, 964 F.3d at 444 (citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (*en banc*)). If Mr. Mustard's testimony is believed, and Mr. Hines is found to have said in the January 30, 2020 meeting that "because of your medical condition, you're not able to perform your job anymore[,]" a reasonable jury could find that Trimen took Mr. Mustard's migraines into account in making its decision to terminate him. But no reasonable jury could find that the migraines were the "but-for" cause of the decision—in other words, that Trimen would not have terminated Mr. Mustard under the same circumstances *but for* the fact of his migraines. Mr. Hines testified that Mr. Mustard's attitude "quickly . . . went downhill" in the six-to-eight months before he was terminated. (D. Hines Dep., 37:5–9.) When Mr. Hines asked why, Mr. Mustard said that he had

11

separated from his wife and was having financial issues. (*Id.*, 37:13–16.) "[Q]ualified service plumbers are very, very difficult to come by[.]" (*Id.*, 72:17–18.) So, instead of terminating Mr. Mustard for any single instance of insubordinate behavior, Mr. Hines "told him that if his attitude didn't change and his call-back rate didn't improve[,] he was on thin ice and would most likely be terminated." (*Id.*, 42:18–43:2.) When Mr. Mustard's "would not cooperate," Trimen made good on that threat. (*Id.*, 74:20–75:3.) Mr. Mustard has not presented any probative evidence connecting his migraines, or resulting time-off, to his callbacks or his poor professional demeanor. There is, therefore, no more than a metaphysical doubt that Trimen would have made the same decision—to terminate Mr. Mustard on January 30, 2020—but for his migraines.

*Comparators*. As to the notion of comparators, Mr. Mustard states: "The rest of my coworkers had just as many callbacks as I did, if not more. The callbacks were posted on a board in the shop where everyone could see them." (Mustard Aff., ¶¶ 20–21.) Particularly in view of his deposition testimony (that he did not know and "would not know" how Trimen handled other plumbers' callbacks (Mustard Dep., 126:1–13)), Mr. Mustard's affidavit amounts to speculation and is insufficient to create a jury question.

The Court notes that Mr. Mustard makes no attempt to identify a comparator with a history of similarly disrespectful behavior as he was alleged to have displayed—nor does he make any effort to rebut or challenges the allegations. It remains undisputed that Mr. Mustard walked out of meetings with Mr. Hines, hung

12

up on Mr. Hines, and stopped taking Mr. Hines's phone calls, all while Mr. Hines was CEO of the company he worked for.

*Temporal proximity.* These reasons diminish any inference of pretext that could be drawn from the closeness in time between Mr. Mustard's frequent migraines and his termination. *See Wyatt*, 999 F.3d at 422 (noting that "a plaintiff cannot rest solely on temporal proximity to establish pretext").

Mr. Mustard has failed to demonstrate a genuine issue of material fact that Trimen's stated reasons for terminating him—his attitude and his callbacks—were pretext for unlawful discrimination.

Trimen's motion for summary judgment on Count I is **GRANTED**.

B.     **Failure to Accommodate (Count II)**

The Court next considers Mr. Mustard's claim that Trimen failed to accommodate his disability. (*See* Compl., ¶¶ 70–77.) Under the ADA, an employer unlawfully discriminates against an employee when it does not make "reasonable accommodations" to the employee's known disability—*unless* the accommodation would be an "undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A). *See also Jakubowski v. Christ Hosp. Inc.*, 627 F.3d 195, 201 (6th Cir. 2010).

"[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007)). Accordingly, the Court "jettison[s]" *McDonnell Douglas* and instead applies a

13

different framework. *Kleiber*, 485 F.3d at 869. First, Mr. Mustard must make a *prima facie* showing that Trimen failed to accommodate his known disability and that his proposed accommodation was reasonable. If he does, "the burden shifts to [Trimen] to demonstrate that [the] particular accommodation would impose an undue hardship[.]" *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 983 (6th Cir. 2011).

> To make out a *prima facie* case for failure to accommodate,
>
> a plaintiff must show that (1) she was disabled within the meaning of the statute; (2) she was otherwise qualified for her position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the defendant failed to provide the necessary accommodation.

*King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 560 (6th Cir. 2022) (citation and internal quotation marks omitted) (cleaned up). Though "the burden of making out a *prima facie* case is not an onerous one[,]" *Hostettler*, 895 F.3d at 855, Mr. Mustard fails to carry it.

Mr. Mustard requested only one accommodation for his migraine headaches—to take off work whenever they struck. He conceded in deposition that Trimen allowed him to do so.[5] Accordingly, Mr. Mustard cannot establish the fifth element of the *prima facie* case: that Trimen failed to provide a necessary

---

[5] In an apparent effort to avoid summary judgment, Mr. Mustard states in his affidavit that Trimen "initially granted my requested accommodation, but everything changed when my migraines increased in frequency from at least once a week to a minimum of two to three times per week in November 2019." (Mustard Aff., ¶ 14.) In deposition, Mr. Mustard conceded that Ms. Hines (Trimen) allowed him to take off when he needed. Accordingly, the sham affidavit rule applies here.

14

accommodation. Trimen is entitled to judgment as a matter of law.

Trimen's motion for summary judgment on Count II is **GRANTED**.

## IV. CONCLUSION

For the reasons set forth above, Trimen's Motion for Summary Judgment (ECF No. 16) is **GRANTED**. The Clerk is **DIRECTED** to **TERMINATE** this case.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**